# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.) No. 17-0487** (Summers County 15-F-53)

**Mark Shane Adkins,**
**Defendant Below, Petitioner**

**FILED**

**June 11, 2018**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Mark Shane Adkins, by counsel Richard M. Gunnoe, appeals the Circuit Court of Summers County's April 28, 2017, order denying his post-trial motion for judgment of acquittal and sentencing him following his conviction of voluntary manslaughter. Respondent State of West Virginia, by counsel Scott E. Johnson, filed a response. Petitioner filed a reply. On appeal, petitioner contends that the circuit court erred in denying his motion for judgment of acquittal because there was insufficient evidence to sustain his conviction.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On November 17, 2015, petitioner was indicted on one count of first-degree murder. The jury trial commenced on February 28, 2017. The evidence at trial showed that on July 19, 2015, Thomas Mathewson, petitioner's next door neighbor, heard petitioner and petitioner's brother, Choya Adkins ("the victim"), bickering and laughing through the day as they worked on a red truck in petitioner's yard. Mr. Mathewson saw one of the brothers enter the residence and remain inside for five to ten minutes. When the person returned, he saw him walk around the truck and immediately heard a gunshot followed by the sound of something heavy landing in the bed of the truck. Mr. Mathewson did not hear any voices or other noise from the yard. After the gunshot, Mr. Mathewson saw a person sit down in the front seat of the red truck. A few minutes passed and a neighborhood boy rode his bike down to the vehicle. Mr. Mathewson heard the boy ask what happened to the victim and heard petitioner respond that the victim had shot himself. Mr. Mathewson immediately went to the home of Mr. Fleshman, petitioner's step-father and neighbor, where he called the police.

At trial, Mr. Fleshman testified that he did not remember seeing Mr. Mathewson that day. However, he remembered receiving a phone call from petitioner, during which petitioner called and asked to speak to his mother, but she was not there. Petitioner told Mr. Fleshman that the

1

victim killed himself and that he intended to leave. Mr. Fleshman advised petitioner to stay until law enforcement arrived.

The first law enforcement officer on the scene was Patrolman Timmy Adkins. Patrolman Adkins testified that when he arrived he saw petitioner and an unidentified female positioned around the body of the victim, which was motionless on the ground. Patrolman Adkins ordered petitioner to move away from the body. Petitioner was shirtless and had facial wounds, a bruised lip, and a large cut above his eye. Patrolman Adkins handcuffed petitioner for officer safety and searched him. He found petitioner's shirt in his back pocket, which was spotted with blood. Petitioner told the patrolman that his brother shot himself. However, with no gun within sight of the body, Patrolman Adkins began to search the area. Eventually, he found a shotgun and a spent cartridge "strategically placed" in the bed of the red truck and with blood smeared along the barrel.

Patrolman Adkins began photographing the scene and collecting evidence. The front seat of the red truck and other items in the truck were bloodied. Blood drops were found on the back of the red truck that led to the front driver's side door. Another vehicle at the residence, a blue truck, was sprayed with blood and displayed a pattern consistent with a body sliding down its frame through the blood. Patrolman Adkins also noticed several empty beer cans in the yard and the bed of the red truck. Sergeant T.J. Cochran arrived on the scene and swabbed petitioner's and the victim's hands for gunshot residue.

Petitioner was transported to the emergency room in police custody and treated for his facial injuries. The emergency room doctor testified that the cut over petitioner's left eye required several sutures to repair. Further, the doctor was concerned that petitioner may have suffered a concussion. Petitioner told the doctor that he was in an altercation with his brother and that his brother shot himself. The doctor testified that petitioner's blood alcohol level at the time of his admission was .275, which is considered a toxic level.

At trial, multiple experts testified regarding evidence found at the scene. The doctor who performed the autopsy opined that the victim was at least three to four feet away from the shotgun when it discharged but that the victim's arm was only two and a half feet long. The doctor also testified regarding a scalloping pattern around the wound that indicated the pellets inside the shotgun shell had begun to disperse as they entered the victim's body. When asked if there was any possible way that the victim could have shot himself, the doctor opined there was no possible way for the wound to be self-inflicted and to have the same characteristics. In addition to the gunshot wound, the victim had a bruised lip and an elevated blood alcohol level. A DNA analyst determined the blood on petitioner's shirt and on the items found inside the cab of the red truck belonged to petitioner. Petitioner's blood was also found on the barrel of the shotgun. A latent fingerprint expert testified that no fingerprints were recovered from the shotgun or the shells. Finally, a trace evidence expert testified that gunshot residue was found on petitioner's hands, but no residue was found on the victim's hands.

Petitioner moved for a judgment of acquittal at the close of the State's case-in-chief; the trial court denied that motion. On March 2, 2017, the jury found petitioner guilty of voluntary manslaughter, a lesser-included offense of first-degree murder. On March 8, 2017, petitioner

moved for entry of a judgment of acquittal arguing that the State presented insufficient evidence to sustain the conviction. On March 27, 2017, the parties appeared for a hearing on petitioner's post-trial motion. Upon finding that sufficient evidence was presented to convict petitioner, the circuit court denied petitioner's motion by order entered on March 31, 2017. Thereafter, the circuit court sentenced petitioner to a determinate sentence of fifteen years of incarceration. Petitioner now appeals the April 28, 2017, sentencing order.

This Court applies a de novo standard of review to appeals from rulings on a motion for judgment of acquittal:

> The trial court's disposition of a motion for judgment of acquittal is subject to our *de novo* review; therefore, this Court, like the trial court, must scrutinize the evidence in the light most compatible with the verdict, resolve all credibility disputes in the verdict's favor, and then reach a judgment about whether a rational jury could find guilt beyond a reasonable doubt.

*State v. LaRock*, 196 W.Va. 294, 304, 470 S.E.2d 613, 623 (1996). Regarding a claim that the evidence at trial was insufficient to convict, this Court has stated that

> [t]he function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Syl. Pt. 1, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). Further,

> [a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

*Id.* at 663, 461 S.E.2d at 169, Syl. Pt. 3, in part.

We begin by noting that "there is no statutory definition of voluntary manslaughter in West Virginia." *State v. McGuire*, 200 W.Va. 823, 833, 490 S.E.2d 912, 922 (1997). Instead, West Virginia Code § 61-2-1 "defines first and second degree murder and specifies the form of

an indictment for either murder or manslaughter." *Id*. at 833 n.22, 490 S.E.2d at 922 n.22.[1] As a result, this Court has held that "[g]enerally speaking, with respect to an unlawful killing, '[i]f malice is proven, the crime becomes second [or first] degree murder; if intent is not proven, the crime becomes involuntary manslaughter.'" *Id*. at 835, 490 S.E.2d at 924 (quoting *U.S. v. Quintero*, 21 F.3d 855, 890 (9th Cir. 1994)). On appeal, petitioner argues that the State failed to present sufficient evidence showing he killed the victim feloniously, unlawfully, and intentionally, upon sudden provocation and in the heat of passion. However, this Court has held that "[g]ross provocation and heat of passion are not essential elements of voluntary manslaughter, and, therefore, they need not be proven by evidence beyond a reasonable doubt." *McGuire*, 200 W.Va. at 825, 490 S.E.2d at 914, Syl. Pt. 3. Here, in viewing the evidence in the light most favorable to the State, we find that there was sufficient evidence from which the jury could find petitioner guilty of voluntary manslaughter.

The combination of expert and lay witness testimony presented at trial provided a sufficient basis on which a jury could have found petitioner guilty of voluntary manslaughter. Petitioner's claim that the victim shot himself was undermined by the testimony of the doctor who performed the autopsy and the trace evidence expert. In the doctor's opinion, the shotgun was fired at the victim from a distance of three to four feet, but the victim's arm was not long enough to hold and discharge the shotgun at that distance. Further, gunshot residue testing confirmed residue on petitioner but not the victim, which supported a theory that the victim did not handle the shotgun and also indicated that petitioner handled the shotgun. Next, Mr. Mathewson's testimony about an individual leaving the residence and moving around the truck, followed by the sound of an immediate gunshot and a heavy object landing in the bed of the truck supported a finding of an intentional action. Further, Mr. Mathewson observed a person open the door of the truck and sit in the driver's seat. The DNA expert later identified the blood on the driver's side of the truck as petitioner's, which supports a conclusion that petitioner was the person Mr. Mathewson saw sit in the vehicle. Finally, petitioner admitted to his emergency room physician that he was in an altercation with his brother that day and suffered serious facial injuries. This admission further supports a conclusion that petitioner acted on impulse and without malice. Based on this evidence, we find that a reasonable jury could have concluded that

---

[1]West Virginia Code § 61-2-1 provides that

> [m]urder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four, capture sixty-a of this code, is murder of the first degree. All other murder is murder of the second degree.

> In an indictment for murder and manslaughter, it shall be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, willfully, maliciously, deliberately, and unlawfully slay, kill and murder the deceased.

petitioner intentionally killed the victim without malice and was guilty of voluntary manslaughter.

In support of his argument, petitioner asserts that certain evidence presented was not credible. Petitioner argues that the key witness, Mr. Mathewson, did not remember the first statement he gave to the investigating officers and that his testimony was significantly different than that prior statement. We find, however, that credibility determinations are for a jury. *See Guthrie*, 194 W.Va. at 663, 461 S.E.2d at 169, Syl. Pt. 3, in part. We decline to assess a witness's credibility from the record. Accordingly, petitioner is entitled to no relief on this issue.

Similarly, petitioner argues that, although his hands tested positive for gunshot residue, testimony was introduced at trial that dust from brake pads is of similar chemical composition and could have produced a false positive for the gunshot residue test. However, the trace evidence expert asserted that she would be able to distinguish between gunshot residue and brake pad dust. Further, petitioner presented no expert testimony to contradict the trace expert's testimony nor did he challenge the introduction of that testimony by a *Daubert*[2] motion. Petitioner's argument again hinges on the credibility of the witness which is in the province of the jury. Therefore, we find petitioner is entitled to no relief.

Finally, petitioner argues that this incident was the medical examiner's first case, she had no specific ballistics training, and, thus, her expert opinion regarding the victim's wound was unfounded. It is apparent that petitioner's argument focuses on the medical examiner's credentials, rather than her credibility. However, the record is clear that the circuit court found the medical examiner qualified as an expert witness and permitted the expert's opinion testimony. Moreover, petitioner did not properly object to the medical examiner's qualifications as an expert witness.[3] "'Our general rule is that nonjurisdictional questions . . . raised for the first time on appeal, will not be considered.' *Shaffer v. Acme Limestone Co., Inc.*, 206 W.Va. 333, 349 n.20, 524 S.E.2d 688, 704 n.20 (1999)." *Noble v. W.Va. Dep't of Motor Vehicles*, 223 W.Va 818, 679 S.E.2d 650 (2009). Accordingly, we find that petitioner is entitled to no relief.

For the foregoing reasons, the circuit court's April 28, 2017, sentencing order is hereby affirmed.

Affirmed.

**ISSUED**: June 11, 2018

---

[2]*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

[3]Petitioner raised a belated objection to the expert testimony of both the medical examiner and the trace evidence expert based on the fact that the State never formally requested that the witnesses be allowed to testify as experts. After petitioner objected, the circuit court found that the witnesses were both qualified as experts and their opinion testimony was admissible. Further, the circuit court found that petitioner waived his right to object by not raising the issue during the experts' testimony.

**CONCURRED IN BY**:

Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Menis E. Ketchum
Justice Elizabeth D. Walker

Justice Loughry, Allen H., II suspended and therefore not participating.