## STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

*In re* **P.G., L.B., M.P., and T.P.**

**No. 25-379** (Wood County CC-54-2024-JA-125, CC-54-2024-JA-126, CC-54-2024-JA-127, and CC-54-2024-JA-128)

## MEMORANDUM DECISION

Petitioner Mother R.P.[1] appeals the Circuit Court of Wood County's May 9, 2025, order terminating her parental rights to the children, arguing that the court erred in failing to consider P.G.'s wishes at disposition, denying the petitioner a post-adjudicatory improvement period, and terminating her rights.[2] Upon our review, we determine that oral argument is unnecessary and that a memorandum decision affirming the circuit court's order is appropriate. *See* W. Va. R. App. P. 21.

The DHS filed a petition in May 2024, alleging that the petitioner failed to protect L.B. from the stepfather's physical abuse.[3] This allegation arose after L.B. arrived at school with significant bruising and reported to a Child Protective Services ("CPS") worker that the stepfather had "punched and smacked him." The DHS amended the petition in June 2024 to add allegations that the petitioner failed to protect P.G. from sexual abuse, also perpetrated by the stepfather. The DHS alleged that in a forensic interview, P.G. described numerous occasions (over many years) when the stepfather had sexually abused and assaulted her and that P.G. "told [the petitioner] once" about the abuse, but "[the petitioner] acted like she didn't know what to do." The petitioner and the stepfather subsequently broke up but then reconciled and married, and, according to the petition, the stepfather's abuse continued. P.G. stated that "she didn't tell [the petitioner] anymore because she knew nothing would change." Shortly after the interview, P.G. tested positive for two sexually transmitted diseases ("STD").

At an adjudicatory hearing in July 2024, the circuit court heard testimony from the individual who conducted two forensic interviews of P.G. and one interview of L.B., to the extent

---

[1] The petitioner appears by counsel John Oshoway. The Department of Human Services ("DHS") appears by counsel Attorney General John B. McCuskey and Assistant Attorney General Wyclif S. Farquharson. Counsel Katrina M. Christ appears as the children's guardian ad litem ("guardian").

[2] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

[3] The stepfather is M.P. and T.P.'s biological father.

necessary to admit the recordings into evidence. The nurse at L.B.'s school and the responding CPS worker both testified that the child presented in May 2024 with extensive bruising and disclosed that the stepfather had hit him. The worker specifically testified that she observed "busted vessels in [L.B.'s] neck" and "a bruised lip and an eye going black," as well as extensive bruising in other areas. The worker testified that she then spoke to the petitioner, who claimed to be unaware of the bruising and offered no explanation for the injuries. Finally, the worker testified that when she suggested that the petitioner file a domestic violence protective order and/or formulate a temporary protection plan, the petitioner "wasn't interested . . . because it would[] be[] inconvenient to have [the stepfather] out of the home."

Adjudication was continued to October 2024, at which time the court heard testimony from a police investigator who participated in executing a search warrant of the petitioner's home. The investigator testified that the search corroborated P.G.'s disclosures regarding the specific locations where the stepfather sexually abused her, including an outdoor shed. Adjudication was again continued to December 2024, at which time P.G.'s medical records were admitted into evidence without objection and a medical provider testified to the extent necessary to admit the petitioner's medical records. P.G.'s paternal grandmother testified that when she brought P.G. home after visits, the child cried and asked not to go back, especially if the petitioner was not home and confirmed that the child was suffering from chlamydia upon removal from the petitioner's home. An investigating police officer testified that the petitioner admitted in June 2024 to having the same STD as P.G., having contracted it from the stepfather.

During her testimony, the petitioner admitted that the stepfather would "smack [L.B.] in the mouth" and "backhand" him when he "[lost] his cool." However, the petitioner denied observing injuries on L.B. before the incident leading to the filing of the initial petition and claimed that she never observed any suspicious interactions between the stepfather and P.G. She confirmed, however, that she removed the stepfather from the home in August 2022, in part, because of allegations of sexual abuse by P.G. and the child's maternal grandmother, though the petitioner suspected that "[her mother] had coerced [P.G.] into saying something." The petitioner acknowledged that she "honestly didn't do anything" after P.G.'s disclosure, seeking neither counseling nor medical care for the child.[4] Despite these circumstances, the petitioner married the stepfather after she became pregnant with T.P., claiming that all the children "seemed like they were okay" with this outcome. The petitioner also denied observing any chlamydia symptoms in P.G. but acknowledged that in early 2024 the child had complained of cramps and had a bloody discharge. She also clarified that when the CPS worker initially asked if she would be willing to remove the stepfather from the home, she "said it would be an inconvenience because he watche[d] [the children] while [she] work[ed] . . . [a]nd . . . [gave her] his money to help [her] pay [the] bills" and she was concerned about maintaining a proper residence for the children.

On January 21, 2025, after the final adjudicatory hearing, the petitioner filed a document entitled "Response/Argument of Respondent [R.P.]," stating that she "[did] not dispute the allegations of physical and sexual abuse of her children by her husband." Further, she "[did] not

---

[4] The petitioner emphasized that P.G. only disclosed the stepfather's abuse to her once, claiming that the child "didn't feel comfortable enough yet to tell anybody" and that "[i]t took our life blowing up for [P.G.] to finally be able to feel like she could speak out."

dispute that she failed to adequately protect the children." In an adjudicatory order entered March 4, 2025, the circuit court found that the petitioner had failed to protect L.B. and P.G. from the stepfather's physical and sexual abuse (respectively), and that, because they were "similarly situated" in the home, M.P. and T.P. were also abused and or neglected children. The petitioner subsequently moved for a post-adjudicatory improvement period.

The petitioner was the sole witness at the dispositional hearing in April 2025. When asked what she should have done differently regarding her knowledge that P.G. was being abused and what she could learn to become a better parent, the petitioner stated that "[her] problem [was] . . . spen[ding] so much time putting trust into people" and that she would "definitely . . . try not to let people get too close to [her]." On cross-examination, the petitioner testified that she had divorced the stepfather, was participating in individual therapy, was employed, and would fully comply with the requirements of an improvement period. The DHS opposed an improvement period and requested that the court terminate the petitioner's parental rights, noting that the petitioner had dodged answering questions about why she had not taken any action in response to P.G.'s disclosure of abuse and that her testimony focused on her needs instead of the child's. The guardian also recommended termination, based on her meetings with the children and conversations with their therapists.

On the record, the court adopted the DHS's and the guardian's position. In a subsequent written order, in which it took notice of the entire case file as well as the petitioner's testimony at disposition and the parties' closing arguments, the court found that the DHS was not required to make reasonable efforts to preserve the family due to the petitioner's knowledge that the stepfather was subjecting P.G. to sexual abuse and her failure to act on that knowledge. The court concluded that the petitioner demonstrated an inadequate capacity to solve the problems of abuse and neglect, on her own or with help, and that "nothing in [her] testimony . . . convince[d] the court to the contrary." The court further noted that "the potential for further abuse [of] the children was so great as to preclude the use of resources to resolve family problems." The court denied the petitioner's motion for an improvement period[5] and found that there was no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected in the near future. Noting that the children needed continuity in care and caretakers, and that a significant amount of time was required to be integrated into a stable and permanent home environment, the court concluded that termination was necessary for the children's welfare and in their best interests. Accordingly, the court terminated the petitioner's parental rights to P.G., L.B., M.P., and T.P.[6] The petitioner now appeals from the dispositional order.

---

[5] The circuit court stated that it denied the petitioner's motion "because she . . . failed to show, though her testimony or other means, that the conditions out of which the abuse and neglect arose were substantially corrected by her, including her failure to protect the children."

[6] The court also terminated the parental rights of L.B.'s father and M.P. and T.P.'s father. P.G.'s father is deceased. The children's permanency plan is adoption in their respective placements.

On appeal from a final order in an abuse and neglect proceeding, this Court reviews the circuit court's findings of fact for clear error and its conclusions of law de novo. Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011); *see also* Syl. Pt. 1, *In re K.A.*, 251 W. Va. 626, 915 S.E.2d 520 (2025) ("We review a circuit court's decision to grant or deny a[n] . . . improvement period under an abuse of discretion standard."). The petitioner first asserts that the circuit court erred in failing to hear or consider P.G.'s wishes before terminating her parental rights, as the child was twelve years old at disposition and of an age of discretion. We disagree. West Virginia Code § 49-4-604(c)(6)(C) requires a circuit court to "give consideration to the wishes of a child [fourteen] years of age or older or otherwise of an age of discretion as determined by the court regarding the permanent termination of parental rights." Because P.G. was only twelve years old, the consideration of her wishes was not statutorily mandated. Moreover, the petitioner does not cite to any point in the record where she proffered or presented evidence to the court that P.G. was of an age of discretion; nor did the petitioner object when the court did not consider P.G.'s wishes at disposition. *See* W. Va. R. App. P. 10(c)(7) (requiring the petitioner's brief to include "citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal"); *see also Shaffer v. Acme Limestone Co., Inc.*, 206 W. Va. 333, 349 n.20, 524 S.E.2d 688, 704 n.20 (1999) ("Our general rule is that nonjurisdictional questions . . . raised for the first time on appeal, will not be considered."). As such, the petitioner is not entitled to relief.

Next, the petitioner asserts that the circuit court erred in denying her motion for a post-adjudicatory improvement period because the court applied the wrong legal standard and because she demonstrated, through her testimony, that she was likely to fully participate. Pursuant to West Virginia Code § 49-4-610(2)(B), circuit courts may grant an improvement period when a parent "demonstrates, by clear and convincing evidence, that [she] is likely to fully participate." However, "granting . . . an improvement period is within the circuit court's discretion," and an improvement period need *not* be granted "when no improvement is likely." *In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002). While the circuit court cited the incorrect standard in denying the petitioner's motion, we find that this does not constitute reversible error as the record also demonstrates that improvement was unlikely. "[I]n order to remedy [an] abuse and/or neglect problem, [a] parent must recognize and acknowledge that . . . [her] conduct constituted abuse[;]" otherwise, an improvement period is futile. *In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013). Here, the petitioner acknowledged the stepfather's abuse but failed to acknowledge that her behavior was abusive as well, frequently denying responsibility for her own conduct. For example, the petitioner married the stepfather *after* P.G.'s disclosure that he had inappropriately touched her. During her testimony, the petitioner rationalized that conduct with the children's apparent agreement to the union and/or failure to object. The petitioner further attempted to minimize her culpability in failing to promptly protect P.G. by claiming that the child had not been ready to "speak out" about the sexual abuse until after the petition was filed. When given the opportunity at disposition to expound on what she needed to learn to be a better parent if she were granted an improvement period, the petitioner gave equivocal answers that focused on her own needs. As such, we conclude that the circuit court did abuse its discretion in denying the petitioner an improvement period.

Lastly, the petitioner asserts that the circuit court erred in terminating her parental rights because the DHS presented "essentially no testimony" at disposition and therefore failed to prove by clear and convincing evidence that she could not substantially correct the conditions which led

to the neglect or abuse or that termination was necessary for the children's welfare. *See* W. Va. Code § 49-4-604(c)(6). We have explained that there is no "particular manner or mode of testimony or evidence by which the [DHS] is obligated to meet [its] burden[]" of proof, though it must present or adopt affirmative evidence upon which the circuit court may base its disposition. *In re K.S.*, 246, W. Va. 517, 526, 874 S.E.2d 319, 328 (2022) (quoting Syl. Pt. 1, in part, *In re S.C.*, 245 W. Va. 677, 865 S.E.2d 79 (2021)). Here, the DHS called the petitioner to testify and asked open-ended questions about what had changed since she first learned of the stepfather's abuse and what she needed to learn to be a better parent. The petitioner also testified to the steps she had taken to improve her circumstances. The circuit court did not find the petitioner's testimony convincing, concluding instead that she had demonstrated an inadequate capacity to solve the problems of abuse and neglect on her own or with help. We have held that "[t]ermination of parental rights . . . may be employed . . . when it is found that there is no reasonable likelihood . . . that conditions of neglect or abuse can be substantially corrected." Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011) (quoting Syl. Pt. 2, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980)); *see also* W. Va. Code § 49-4-604(d) (defining "[n]o reasonable likelihood that conditions of neglect or abuse can be substantially corrected" to mean that "the abusing adult . . . ha[s] demonstrated an inadequate capacity to solve the problems of abuse or neglect on [her] own or with help."). Nor did the court err in concluding that the children's welfare necessitated termination, as it found that there was great potential for further abuse and that the children needed continuity in care and caretakers. Circuit courts are permitted to terminate a parent's rights upon such findings. *See* W. Va. Code § 49-4-604(c)(6). Accordingly, we find no error.

For the foregoing reasons, we find no error in the decision of the circuit court, and its May 9, 2025, order is hereby affirmed.

Affirmed.

**ISSUED**: June 1, 2026

**CONCURRED IN BY**:

Chief Justice C. Haley Bunn
Justice William R. Wooton
Justice Charles S. Trump IV
Justice Thomas H. Ewing
Justice Gerald M. Titus III